**14 CV 3587**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| ELI WEISBLUM, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No.: |
| v. | **CLASS ACTION COMPLAINT** |
| PROPHASE LABS, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Eli Weisblum ("Plaintiff" or "Weisblum") brings this action on behalf of himself and all others similarly situated against ProPhase Labs, Inc. ("Defendant" or "ProPhase"). Plaintiff makes the following allegations based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      This is a class action lawsuit against Defendant for the false and misleading marketing, advertising, and sale of its homeopathic over-the-counter ("OTC") line of Cold-EEZE Cold Remedy Products, which includes Cold-EEZE Cold Remedy Lozenges,[1] Cold-EEZE Cold Remedy Sugar Free Lozenges,[2] Cold-EEZE Cold Remedy Oral Spray,[3] Cold-EEZE Cold Remedy Daytime/Nighttime QuickMelts, Cold-EEZE PLUS Immune Support QuickMelts, and Cold-EEZE PLUS Immune Support and Energy QuickMelts, (collectively, the "Cold-EEZE Products"). Defendant represents on the packaging and labeling of the Cold-EEZE Products that

---

[1] Defendant offers the lozenges in the following six flavors: Cherry, Honey Lemon, Strawberries & Cream, Tropical Orange, Lemon Lime, and Mint Frost.

[2] Defendant offers the sugar free lozenges in the following four flavors: Sugar Free Honey Lemon, Sugar Free Wild Cherry, Sugar Free Pomegranate, and Sugar Free Chocolate Mint.

[3] Defendant offers the oral spray in two flavors, Mint and Cherry.

1

Cold-EEZE "reduce[s] the duration of the common cold" and "reduces the severity of cold symptoms: cough, sore throat, nasal congestion, post nasal drip and/or hoarseness" (together with the other misrepresentations discussed herein, the "Misrepresentations"). All of the Cold-EEZE Products share the same Misrepresentations, active ingredients, and marketing scheme.

2.      The Misrepresentations are false and misleading. None of the studies relied upon by Defendant demonstrate that Cold-EEZE is clinically proven to reduce the duration of the common cold or reduce the severity of cold symptoms. More importantly, studies that have tested Cold-EEZE, including one partially funded by Defendant, have concluded that Cold-EEZE is ineffective – it does not reduce either the duration of the common cold or the severity of its symptoms.

3.      This is not Defendant's first rodeo. In 1999, Defendant entered into a Consent Agreement with the Federal Trade Commission ("FTC") to settle FTC charges for claims made on the QVC cable network that Cold-EEZE could prevent colds and reduce the risk of contracting pneumonia, among other things. Pursuant to the Consent Agreement, Defendant agreed to stop making those representations.

4.      As a direct and proximate result of Defendant's false and misleading labeling and marketing, Plaintiff and members of the Class, as defined herein, purchased Defendant's ineffective Cold-EEZE Products. Specifically, Defendant deceived Plaintiff into believing that the Cold-EEZE Products were effective for reducing the duration of the common cold and the severity of its symptoms. As a result, Plaintiff and members of the Class purchased the Cold-EEZE Products, suffered injury in fact, and suffered an ascertainable out-of-pocket loss. Plaintiff and members of the Class seek a full refund of the transaction and/or all further statutory, equitable and injunctive relief as provided by applicable law.

5.      Plaintiff seeks relief in this action individually, and on behalf of similarly situated purchasers of Cold-EEZE for violation of New York General Business Law § 349, violation of New York General Business Law § 350, unjust enrichment, negligent misrepresentation, and fraud.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d) because there are more than 100 class members and the aggregate amount in controversy

exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a

citizen of a state different from Defendant.  For fiscal year 2013, ProPhase recorded revenues of

$25,032,000, of which approximately 94%, or $23.5 million, is attributable to sales of Cold-

EEZE. [4]

7.      This Court has personal jurisdiction over Defendant because Defendant conducts

substantial business within New York, such that Defendant has significant, continuous, and

pervasive contacts with the State of New York.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the

challenged mislabeling, sales, and marketing practices have been disseminated and committed in

this District; because Defendant is subject to personal jurisdiction in this District; and because

Plaintiff purchased the product in this District.

## THE PARTIES

9.      Plaintiff Eli Weisblum is a citizen of New York, residing in Forest Hills, New

York.  In or about January 2014, Plaintiff Weisblum purchased a package of the Cold-EEZE

lozenges for approximately $6 from a Duane Reade retail store located at 711 Third Avenue,

New York, NY 10017.  Prior to his purchase of Cold-EEZE while suffering from a common

cold, Mr. Weisblum heard Defendant's media advertisements and reviewed the product's

packaging and labeling.  The package he purchased represented that Defendant's Cold-EEZE

Products were "clinically proven to reduce the duration of the common cold by almost half."

The package also represented that the Cold-EEZE Product would "reduce the duration of the

common cold" and "reduce[] the severity of cold symptoms:  cough, sore throat, nasal

congestion, post nasal drip and/or hoarseness."   Finally, the package represented that the Cold-

---

[4] March 27, 2014 10-K at 22, 39 *available at*
https://www.sec.gov/Archives/edgar/data/868278/000114420414018406/v371069_10k.htm (last
visited May 15, 2014).

EEZE Product would "shorten[] [his] cold."  Plaintiff Weisblum saw these representations prior to and at the time of purchase, and understood them as representations that the Cold-EEZE Product he purchased was (i) clinically proven to reduce the duration of his cold by almost half the time that he would have had the cold if he were not using Cold-EEZE, (ii) effective for reducing the severity of his cold symptoms, including coughing, nasal congestion, and a sore throat, and (iii) effective to shorten his cold.  He relied on these representations in deciding to purchase the Cold-EEZE Product.  Accordingly, these representations were part of the basis of the bargain, in that he would not have purchased Cold-EEZE had he known that it was, in fact, not clinically proven to reduce the duration of a cold and the severity of cold symptoms. Ultimately, Cold-EEZE was worthless (and certainly worth less than its misrepresentations suggested).  Even though Plaintiff Weisblum used Cold-EEZE according to the directions for use on the back of the package, Cold-EEZE did not perform as advertised.  In fact, it was totally ineffective.

10.    Defendant ProPhase Labs, Inc. is a Nevada corporation with its headquarters at 621 N. Shady Retreat Road, Doylestown, Pennsylvania 18901.  ProPhase is a publicly traded company currently registered on the NASDAQ Global Market.  Prior to May 6, 2010, ProPhase operated as The Quigley Corporation ("Quigley").  ProPhase has and is engaged in the manufacture, distribution, marketing, and sale of over-the-counter cold remedy products to consumers through national chain, regional, specialty, and local retail stores.  Its principal products are the Cold-EEZE Products, which are zinc gluconate glycine products that it claims are proven by clinical studies to reduce the duration and severity of the common cold by nearly half.

11.    Defendant advertises, markets, and sells Cold-EEZE widely throughout New York and nationwide.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.  Defendant's False And Misleading Packaging And Labeling

12.    All of the Cold-EEZE Products are essentially the same product delivered in

different forms.  For example, Defendant represents that "[t]he new Cold-EEZE Cold Remedy Oral Spray is formulated with zinc gluconate, the same effective active ingredient found in the best-selling, clinically proven and #1 pharmacist recommended Cold-EEZE lozenges.  The effective unique formula reduces the duration of the common cold."[5]  The same is true for each of the three QuickMelts varieties – according to Defendant one tablet of each variety "delivers the same amount of active ingredient (zinc gluconate glycine) as one clinically-proven and #1 pharmacist recommended Cold-EEZE lozenge." [6]

13.    On the labeling of its Cold-EEZE Products, depicted below, Defendant makes numerous false and misleading advertising claims.

14.    The labeling of all Cold-EEZE Products represents that Cold-EEZE "reduce[s] the duration of the common cold" and "reduces the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness":



Additionally, the labeling represents that Cold-EEZE "[s]hortens your cold, works faster":

---

[5] *See* http://www.cold-eeze.com/products/oral-spray/with%20zinc%20gluconate (last visited May 15, 2014).

[6] *See* http://coldeeze.com/products (last visited May 15, 2014).



Regardless of the product, the message to consumers is clear and conspicuous: Cold-EEZE will reduce the duration and severity of your cold.  However, as shown below, these claims are provably false.

15.     The label of the Cold-EEZE Lozenges bears an additional misleading tagline: "Clinically proven to reduce the duration of the common cold."  In fact, this central claim appears on the labeling of the Lozenges in four different places:



16.     Defendant further reaffirms this message on the back label of the Lozenges by

representing to consumers that "[c]linical studies have shown:  [t]he unique Cold-EEZE formula reduces the duration of the common cold by almost half."   In fact, as discussed more fully below, Defendant's "clinical pro[of]" actually demonstrates that Cold-EEZE will not shorten a cold or reduce the severity of its symptoms.



17.    Defendant deliberately and intentionally made the material Misrepresentations about its Cold-EEZE Products.  Notably, one of the scientific studies that demonstrates the falsity of Defendant's Misrepresentations was partially funded by Defendant.  Thus, despite Defendant's knowledge about the study results showing the falsity of its Misrepresentations, Defendant continues to showcase the Misrepresentations prominently on its Cold-EEZE packaging while simultaneously failing to disclose the adverse results of its own study to consumers.

### B.  Clinical Studies Show That Cold-EEZE Is Not Effective

18.    Clinical studies demonstrate the falsity of Defendant's Misrepresentations.  For example, in Macknin, Piedmonte, *et al*., 1998 (the "Macknin Study"), funded in part by Defendant, concluded Cold-EEZE was "***not effective*** in treating cold symptoms in children and adolescents."[7] (emphasis added).  Importantly, the Macknin Study does not suffer from the infirmities that the studies cited by Defendant do.  *See infra* ¶¶ 22-28.  In fact, the Macknin

---

[7] Macknin, Piedmonte, *et al*., *Zinc Gluconate Lozenges for Treating the Common Cold in Children: A Randomized Controlled Trial*, JAMA. 1998; 279(24): 1962-1967.

Study was a randomized, double blinded, and placebo-controlled 249-person study that satisfied all of the 11 criteria identified by Thomas J. Caruso as "necessary for valid experimental design."  *See infra* note 13, at 571 ("Among the 7 studies reporting no effect, 3 fulfilled all criteria," including the Macknin study).  The authors found that:  (1) the time to resolve all cold symptoms was identical in the placebo and Cold-EEZE groups; (2) Cold-EEZE had "no significant effect on the time for resolution on any of the individual symptoms;" (3) difference in school absences between the groups was not statistically significant; and (4) slightly more students in the Cold-EEZE group experienced at least one adverse effect than in the placebo group.  The Macknin Study ultimately concluded that "[a]dditional studies in all age groups with different dosages and formulations of zinc lozenges and with virologic testing are needed to define what role, if any, zinc has in the treatment of common cold symptoms."

19.    In another relevant study, Turner, Cetnarowski, 2000 (the "Turner Study"), the authors found that Cold-EEZE "had no effect on the duration or severity of symptoms in either the experimental or natural study model" and "zinc compounds appear to have little utility for common-cold treatment." [8]  The Turner Study was a double-blind, randomized, placebo-controlled study on the effect of zinc treatment on the duration of severity of common-cold symptoms using zinc acetate lozenges, placebo lozenges, and Cold-EEZE lozenges.  Like the Macknin Study, the Turner Study met all 11 criteria set forth in the Caruso Study.  *See infra* note 13, at 571.

20.    Furthermore, Cold-EEZE is not simply ineffective for "reduc[ing] the duration of the common cold," it is also ineffective for "reduc[ing] the severity of cold symptoms."  Indeed, the 2013 Cochrane Report[9] concluded that even a milligram formulation of zinc ***was not***

---

[8] Turner and Cenarowski, *Effect of Treatment with Zinc Gluconate or Zinc Acetate on Experimental and Natural Colds*, Clinical Infectious Diseases.  2000; 31:1202-8.

[9] The 2011 Cochrane Systematic Review cited by Defendant was updated by the authors in 2013. *See* Singh M, Das RR., "Zinc for the Common Cold", 12 Cochrane Database of Systematic Reviews 2013 CD001364, *abstract available at* http://onlinelibrary.wiley.com/doi/10.1002/14651858.CD001364.pub4/abstract (last visited May 15, 2014).

*associated with a reduction of the severity of common cold symptoms*. Thus, the Cochrane

Report also demonstrates that Defendant's representation that the Cold-EEZE Products "reduce[]

the severity of cold symptoms: cough, sore throat, nasal congestion, post nasal drip and/or

hoarseness" is affirmatively false and misleading.

21.    As these clinical studies demonstrate, Defendant's Cold-EEZE Products are not

effective. Despite knowledge of these adverse studies – one of which was partially funded by

Defendant – Defendant continues to unequivocally claim that with its proprietary zinc formula,

Cold-EEZE is reduces the duration and severity of the common cold. Moreover, even though

these studies contradict Defendant's claims, they intentionally omit these adverse studies from

the section of their website dedicated to discussing the clinical studies. Thus, despite Defendant's

knowledge about the study results showing the falsity of its Misrepresentations, Defendant

continues to showcase the Misrepresentations prominently on its Cold-EEZE packaging.

### C.  The Clinical Studies Cited By Defendant Are Unsound

22.    On the labeling of the Cold-EEZE Products, Defendant deceptively represents

that Cold-EEZE's efficacy is shown by "two clinical studies," which they represent as

"independent double blind studies" conducted by Mossad, *et al*. in 1996 (the "Mossad Study")[10]

and Godfrey, *et al*. in 1992 (the "Godfrey Study").[11]  On its "Cold-EEZE Clinical Studies"

webpage, Defendant once again identifies the Mossad and Godfrey studies, as well as six other

purportedly "published, peer-reviewed clinical studies that show the powerful and safe effects"

of Cold-EEZE.[12]  These studies, however, do not demonstrate Defendant's claims.

23.    As an initial matter, these two studies are ***not "independent."***  One of the authors

of the Mossad Study, Dr. Michael L. Macknin, had a financial interest in Defendant when the

---

[10] Mossad S.B., Macknin J.L., Medendorp S.V., Mason P., *Zinc Gluconate Lozenges for Treating the Common cold: A Randomized, Double Blind, Placebo-Controlled Study*, Am. Intern. Med. 1996; 125: 81-8.

[11] Godfrey J.C., Conant Sloane B. Smith D.S., Turco J.H., Mercer N., Godfrey N.J., *Zinc Gluconate and the Common Cold: A Controlled Clinical Study*, J. Int. Med. Res. 1992; 20:234-46.

[12] *See* http://coldeeze.com/about#studies (last visited May 15, 2014).

study results were published, a fact not revealed until after the study was published.  The principal author of the Godfrey study, John C. Godfrey, not only *owned the patent on Cold-EEZE's active ZGG ingredient*, but had also sold the exclusive distribution rights to the formula to Defendant in exchange for a 3% royalty and a 2% consulting fee based on Cold-EEZE sales.  Despite its duty to disclose this information, Defendant relied on these studies while omitting the fact that they were conducted by interested insiders.

24.     Moreover, these studies are fundamentally flawed.  In the Caruso Study, the authors determined that the studies cited by Defendant were plagued by a host of experimental design defects.[13]  Per the authors, competent and reliable clinical studies require, *inter alia*, the following:

*Validated case definition*. The validated case definition provides signal quality and reduces noise by ensuring that the cases have the disease of interest based on validated criteria for diagnosis. "Signal quality" refers to the accurate measurement of an event (signal) of interest—in this case, cold symptoms—without dilution of the signal by similar events, such as respiratory symptoms due to other causes, such as allergy or respiratory tract irritants that would represent "noise."

*Quantifiable hypothesis*. A quantifiable hypothesis provides an end point, which allows for the calculation of sample size relative to defined statistical power. This addresses the problem of chance.

*Sample size calculation*. Given a quantifiable hypothesis, calculations should be performed to assure that a study has a large enough sample size to meet a predetermined statistical power. This also addresses the problem of chance.

*Randomized assignment*. Random assignment of cases to the experimental and control groups is necessary to ensure that study populations are as similar as possible. This reduces known and unknown biases that may affect the validity of the results.

*Double blinding*. Unblinded studies are biased toward finding a treatment effect. Data should be supplied to show that blinding was not only attempted but also was effective. This is especially important for zinc preparations, which characteristically have a "medicinal" taste and often lead to nausea.

*Proof of blinding*. A separate, controlled experiment to test the adequacy of blinding should ideally be performed before the clinical trial is conducted. When performed after the study, it is acceptable only in a negative study. In a positive study, post study proof of

---

[13] *See* Thomas J. Caruso, *et al., Treatment of Naturally Acquired Common Colds With Zinc: A Structured Review,* Clin. Infect. Dis. 2007;45:569-74 ("Caruso Study").

blinding is unacceptable, because there is no way to determine whether judgments were made on the basis of a bias or a true therapeutic effect.

***Measurement of compliance***. Signal quality is also dependent on the degree of compliance of subjects. Compliance should be monitored to evaluate the amount of bias that could result from subjects' failure to take study preparations as directed.

***Measurement of dropout rate***. Dropout rates should be measured to evaluate whether statistical power was maintained.

***Intent-to-treat analysis***. Results should be analyzed by the intent-to-treat principle to maintain randomization and statistical power. Scores from all cold symptoms included in the research protocol should be reported.

***Methods of statistical analysis***. A description of the methods of statistical analysis should be provided to assess the appropriateness of the tests applied to the data.

***Measurements of probability***. This information should be provided to evaluate the precision of the findings.

25.     The Caruso Study found that the "two clinical studies" on the product label upon which Defendant bases its claims suffer from several material deficiencies, including no proof of blinding, no quantifiable hypothesis, no microbiological common cold diagnosis, and no intent-to-treat analysis, all of which are necessary components of a competent and reliable clinical or scientific trial.

26.     The purported clinical studies upon which Defendant relies and directs consumers to are not properly constructed clinical studies and do not constitute clinical proof of Cold-EEZE's effectiveness.  In fact, these do not in any way indicate that the Cold-EEZE Products do what Defendant claim.  For example, the Godfrey Study did not even test a Cold-EEZE product – instead, the subjects consumed a dose of ***23.7 mg of zinc gluconate glycine*** ("ZGG") about eight times per day.  This is a significantly higher dose than contained in Cold-EEZE, which purports to contain 13.3 mg of ZGG (i.e., 44% less).  Moreover, the Godfrey Study had no quantifiable hypothesis, no sample size calculation, no intent-to-treat analysis, and no proof of blinding.  Proof of blinding was also lacking in the Mossad Study.  *See* Caruso Study at 571-72. Given that the zinc lozenges have a distinct metallic aftertaste,[14] subjects could not have possibly

---

[14] For example, the Mossad Study reported that many patients reported that the "lozenges had an aftertaste."

been "blinded" since it was clear which lozenges contained zinc and which did not.  *See* Caruso Study at 572.  The Mossad Study itself identified seven additional "limitations" of its study.  *See* Mossad Study at 87.

27.    As a result, neither of the two studies specifically cited and relied upon on the labeling of Cold-EEZE supports Defendant's claim that Cold-EEZE "reduce[s] the duration of the common cold" and "reduce[s] the severity of cold symptoms."

28.    Moreover, the six other studies Defendant identifies on its website as purportedly supporting its claims suffer from even greater shortcomings.[15]  Three of the six studies tested zinc formulations different from the one used in the Cold-EEZE Products (zinc gluconate glycine), thereby rendering their results unrelated to the efficacy of the Cold-EEZE Products.[16] The three other "studies" identified by Defendant are not actually studies but rather summaries and re-analyses of past studies.[17]

---

[15] *See* http://coldeeze.com/uploaded_files/files/displaypdf-studies.php (last visited May 15, 2014).

[16] Geist F, Bateman J, Hayden F. In vitro activity of zinc salts against human rhinoviruses. *Antimicrobial Agents and Chemotherapy* 1987;31:622–4.  (Testing zinc gluconate but *not* zinc gluconate glycine).

Korant BD, Butterworth BE. Inhibition by zinc of rhinovirus protein cleavage: interaction of zinc with capsid polypeptides.  *Journal of Virology* 1976; 18: 298-306.  (Testing zinc choloride and zinc acetate).

Prasad AS, Beck FWJ, Bao B, Snell D, Fitzgerald JT. Duration and severity of symptoms and level of plasma Interleukin-1 receptor antagonist, soluble tumor necrosis factor receptor, and adhesion molecules in patients with common cold treated with zinc acetate.  *Journal of Infectious Diseases* 2008; 197:795-802.  (Testing zinc acetate).

[17] Novick SG, Godfrey JC, Godfrey NJ, Wilder HR. How does zinc modify the common cold? Clinical observations and implications regarding mechanisms of action.  *Medical Hypotheses* 1996;46:295–302. (Reviewing earlier studies and hypothesizing a possible explanation for *how* zinc lozenges work).

Eby GA. Zinc lozenges: cold cure or candy? Solution chemistry determinations.  *Bioscience Reports* 2004;24:23–39, at 24 ("In this ***re-analysis*** of all published reports of double-blind, placebo controlled clinical trials of zinc lozenges against the duration of common colds …") (emphasis added).

**D.  Defendant Labels Cold-EEZE As Homeopathic To Escape FDA Scrutiny And To Deceive Consumers About Its Effectiveness**

29.    Defendant labels its Cold-EEZE Products "homeopathic" for one reason – to avoid the FDA's stringent regulations and scrutiny.  Stated otherwise, unlike traditional drugs, homeopathic products are not regulated by the FDA.  Since Defendant labels the Cold-EEZE Products as homeopathic, the FDA does not regulate Defendant's statements and representations, thus leaving consumers in the dark regarding the veracity of those statements and representations.  Indeed, to determine whether *non*-homeopathic OTC drugs are safe, effective, and not misbranded, the FDA subjects non-homeopathic OTC drugs to stringent evaluations and testing using a drug monograph system created by the FDA.  *See* 21 C.F.R. §§ 330.1, 330.10.  In drafting the monographs, the FDA divided the non-homeopathic OTC drugs into drug categories, which were then assigned an advisory review panel of qualified experts who evaluate the safety and effectiveness of the non-homeopathic OTC drugs.  The panel also reviews the drugs' labeling and advises the FDA Commissioner on the promulgation of monographs establishing conditions under which non-homeopathic OTC drugs listed within each monograph are generally recognized as safe, effective, and not misbranded.  *Id.* § 330.10(a).

30.    Under this system, a manufacturer seeking approval of a new, non-homeopathic OTC drug must submit a detailed new drug application, which must include:

> [E]vidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

---

Singh M, Das RR. Zinc for the common cold. *Cochrane Database of Systematic Reviews* 2011, Issue 2. Art. No.: CD001364.  DOI: 10.1002/14651858.CD001364.pub3.  (Screening 144 past studies, identifying and re-analyzing 15 of those, and drawing conclusions).

21 U.S.C. § 355.  Moreover, after the FDA approves a new drug application, any change in the drug's labeling requires a supplement to the application and further approval by the FDA either before or after the change.  21 C.F.R. §§ 314.70(b), (c), 314.71.

31.     In stark contrast, homeopathic OTC drugs, including the Cold-EEZE Products, are neither approved nor authorized by the FDA.  As stated on the bottom of Defendant's website, "These statements have not been reviewed by the Food and Drug Administration."

32.     Furthermore, on the U.S. National Library of Medicine ("the NLM") website responsible for providing information about FDA drug listing information, the NLM specifically states the following about Cold-EEZE: "THIS HOMEOPATHIC PRODUCT HAS NOT BEEN EVALUATED BY THE FOOD AND DRUG ADMINISTRATION FOR SAFETY OR EFFICACY.  [THE] FDA IS NOT AWARE OF SCIENTIFIC EVIDENCE TO SUPPORT HOMEOPATHY AS EFFECTIVE."[18]

## CLASS ACTION ALLEGATIONS

33.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased Cold-EEZE for personal or household use, excluding those who purchased Cold-EEZE for resale (hereafter, the "Class").

34.     Plaintiff also seeks to represent a subclass defined as all members of the Class who purchased Cold-EEZE within State of New York (the "New York Subclass").

35.     Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and the New York Subclass number in the millions.  The precise number of Class and Subclass members and their identities are unknown to Plaintiff at this time but may be determined through discovery of the records of Defendant and third party retailers and vendors.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant and third party retailers and vendors.

---

[18] *See* "COLD-EEZE" (zinc gluconate) lozenge [ProPhase Labs, Inc.]," http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=969b0895-0d14-47e7-adf8-33730c69e686 (last visited May 15, 2014).

36.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to whether Defendant's labeling, advertising, and marketing of Cold-EEZE is false and misleading as complained herein.

37.     The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff (a) was exposed to Defendant's false and misleading labeling, packaging, marketing, and promotion of Cold-EEZE; (b) relied on Defendant's Misrepresentations; and (c) suffered a loss as a result of his purchase.  Each Class member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

38.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

39.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### (Deceptive Acts Or Practices, New York Gen. Bus. Law § 349)

40.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

41.     Plaintiff brings this Count I individually and on behalf of the members of the New York Subclass against Defendant.

42.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by making the Misrepresentations.

43.     The foregoing deceptive acts and practices were directed at consumers.

44.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Cold-EEZE Products to induce consumers to purchase same.

45.     Plaintiff and members of the New York Subclass were injured because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.  As a result, Plaintiff and the New York Subclass have been damaged in the amount of the purchase price of the Cold-EEZE Products, i.e., the difference in value between the Cold-EEZE Products as advertised and the Cold-EEZE Products as actually sold. Because the Cold-EEZE Products are ineffective, they are totally worthless.

46.     As a result of Defendant's false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, Plaintiff and members of the New York Subclass have suffered and continue to suffer economic injury.

47.     Plaintiff and members of the New York Subclass suffered an ascertainable loss caused by Defendant's Misrepresentations equal to the purchase price of the Cold-EEZE Products.

48.     On behalf of himself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT II

### (False Advertising, New York Gen. Bus. Law § 350)

49.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

50.     Plaintiff brings this Count II individually and on behalf of the members of the New York Subclass against Defendant.

51.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

52.     Defendant's false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were and are directed to consumers.

53.     Defendant's false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

54.     Defendant's false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, have resulted in consumer injury or harm to the public interest.

55.     Plaintiff and members of the New York Subclass were injured because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms

17

per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.  As a result, Plaintiff and the New York Subclass have been damaged in the amount of the purchase price of the Cold-EEZE Products, i.e., the difference in value between the Cold-EEZE Products as advertised and the Cold-EEZE Products as actually sold. Because the Cold-EEZE Products are ineffective, they are totally worthless.

56.     As a result of Defendant's false, misleading and deceptive statements and representations of fact, including but not limited to the Misrepresentations, Plaintiff and members of the New York Subclass have suffered and continue to suffer economic injury.

57.     Plaintiff and members of the New York Subclass suffered an ascertainable loss caused by Defendant's Misrepresentations equal to the purchase price of the Cold-EEZE Products.

58.     On behalf of himself and other members of the Class and New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III

### (Unjust Enrichment)

59.     Plaintiff repeats the allegations of the foregoing paragraphs as if fully set forth herein.

60.     Plaintiff brings this Count III individually and on behalf of members of the Class and Subclass against Defendant.

61.     Plaintiff and members of the Class and Subclass conferred benefits on Defendant by purchasing Cold-EEZE.

62.     Defendant has knowledge of such benefits.

63.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class and Subclass members' purchases of the Cold-EEZE Products.  Retention of

those moneys under these circumstances is unjust and inequitable because Defendant falsely and misleadingly represented that its Cold-EEZE Products were clinically proven to reduce the duration of the common cold, were effective for reducing the duration of the common cold, and were effective for reducing the severity of cold symptoms, which caused injuries to Plaintiff and members of the Class and Subclass because they would not have purchased for the Cold-EEZE Products had the true facts been known.

64.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Class and Subclass is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class and Subclass for their unjust enrichment, as ordered by the Court.

## COUNT IV

### (Negligent Misrepresentation)

65.    Plaintiff repeats the allegations of the foregoing paragraphs as if fully set forth herein.

66.    Plaintiff brings this Count IV individually and on behalf of members of the Class and Subclass against Defendant.

67.    As discussed above, Defendant represented that the Cold-EEZE Products were, in fact, effective for reducing the duration of the common cold and for reducing the severity of its symptoms but failed to disclose the fact that studies of Cold-EEZE (including one partially funded by Defendant) have shown it to be ineffective.  Specifically, Defendant (i) misrepresented the clinical efficacy of the Cold-EEZE Products even though its own studies showed otherwise, and (ii) omitted the fact that some of the studies they cite were performed by insiders to the company.  Defendant had a duty to disclose this information.

68.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

19

69.     At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Cold-EEZE Products.

70.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Cold-EEZE Products.

71.     Plaintiff and Class members would not have purchased the Cold-EEZE Products if the true facts had been known.

72.     The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## <u>COUNT V</u>

### (Fraud)

73.     Plaintiff repeats the allegations of the foregoing paragraphs as if fully set forth herein.

74.     Plaintiff brings this Count V individually and on behalf of members of the Class and Subclass against Defendant.

75.     As discussed above, Defendant made false and misleading representations, including the Misrepresentations.  Specifically, Defendant (i) misrepresented the clinical efficacy of the Cold-EEZE Products even though its own studies showed otherwise, and (ii) omitted the fact that some of the studies they cite were performed by insiders to the company.  Defendant had a duty to disclose this information.

76.     The false and misleading representations and omissions were made with knowledge of their falsehood.

77.     The false and misleading representations and omissions were made by Defendant, upon which Plaintiff and members of the Class and Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and Class and Subclass members to purchase the Cold-EEZE Products.

78.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

79.     WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

a.  For an order certifying the nationwide Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel;

b.  For an order declaring that Defendant's conduct violates the statues reference herein;

c.  For an order finding in factor of Plaintiff, the nationwide Class, and the New York Subclass on all counts asserted herein;

d.  For statutory, compensatory, and punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For injunctive relief as pleaded or as the Court may deem proper;

h.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees, and expenses;

i.  Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

j.  For such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated:  May 19, 2014

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  _Joseph I. Marchese_
Joseph I. Marchese

Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
Neal J. Deckant (ND1984)
Yitz Kopel (YK5522)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
          jmarchese@bursor.com
          ndeckant@bursor.com
          ykopel@bursor.com

*Attorneys for Plaintiff*